IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES McCLENDON,                )
                                  )
            Plaintiff,            )
                                  )
     v.                           )   No. 12 C 2021
                                  )
ILLINOIS DEPARTMENT OF            )
TRANSPORTATION, CARMEN W.         )
IACULLO, and JAMES A.             )
STUMPNER,                         )
                                  )
            Defendants.           )

## MEMORANDUM OPINION AND ORDER

In September 2010, the Illinois Department of
Transportation ("IDOT") fired Charles McClendon ("McClendon")
from his job as a maintenance yard technician.  McClendon thinks
IDOT's stated reason for his termination--an inspector general's
report concluding that he submitted fraudulent overtime hours--
is a lie.  He claims that IDOT actually fired him because of his
race and in retaliation for his complaints about race
discrimination, his affiliation with the Republican Party, and
his union organizing activities.

IDOT and two of McClendon's former supervisors
(collectively, "Defendants") have moved for summary judgment on
his race discrimination and retaliation claims.  For the reasons
stated below, I grant Defendants' motion only with respect to

Count V, McClendon's retaliation claim under the First
Amendment.

## I.  Background

At the summary judgment stage, I must view the evidence in
the light most favorable to McClendon and draw all "justifiable
inferences" in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 255 (1986).

McClendon, who is African-American, began his employment
with IDOT in 1997 as a seasonal motor truck driver.  Two years
later, IDOT hired him as a Highway Maintainer and then promoted
him to Environmental Technician III.  In 2000, after training as
a Maintenance Cadre for one year, McClendon became an
Environmental Technician V or "Yard Technician."  As a Yard
Technician, McClendon was responsible for managing one of IDOT's
twenty-three maintenance yards in District 1, which covers the
six counties in northeastern Illinois.  McClendon managed IDOT's
maintenance yard near Interstate 57 ("the I-57 Yard") on the
south side of Chicago from 2000 until IDOT fired him in 2010.

McClendon's immediate supervisor after his promotion to
Yard Technician was Defendant James Stumpner ("Stumpner"), the
South Area Operations Manager.  In 2002, Stumpner was promoted
to Chief of IDOT's Maintenance Bureau in District 1.  Stumpner,
in turn, reported to Defendant Carmen Iacullo ("Iacullo"), who
served as Acting Operations Manager over the Bureau of

2

Maintenance and Assistant to IDOT's Regional Engineer for
District 1 from 2004 until 2014.

## A. McClendon's political affiliation

Iacullo's arrival at IDOT coincided with the beginning of
former Governor Rod Blagojevich's administration.  Unlike the
IDOT administrators who came into power during the Blagojevich
administration, McClendon was a self-identified Republican who
was active in national, state, and local politics.

McClendon has presented evidence that Stumpner and Iacullo
were both aware of his political affiliation.  In either 2000 or
2004, McClendon asked Stumpner for vacation time to attend
former President George W. Bush's inauguration in Washington,
D.C.  McClendon Dep. at 71.  When making this request, which
Stumpner approved, McClendon disclosed his support for the
Republican Party to Stumpner.  *Id.*

McClendon also had conversations about his political
affiliation with Iacullo.  *Id.* at 70.  One conversation occurred
in approximately 2005 after IDOT employees Ray Frais and Jack
Neven searched Stumpner's office for evidence of whether he was
engaging in political activities on the job.  *Id.* at 71-73;
McClendon Declar. at ¶ 9.  McClendon and his immediate
supervisor at the time, Al Richardson, went to IDOT District 1
headquarters in Schaumberg to discuss the search.  *Id.*  When
McClendon asked why his office had been searched, Iacullo denied

knowing anything about it, but remarked that "we all have different affiliations."  McClendon Dep. at 72.

McClendon then discussed the search with Neven, who explained that Iacullo and Stumpner had instructed him to investigate a complaint that McClendon was engaging in political campaigning on IDOT work time.  *Id*. at 169-70.  Neven identified himself as a Democrat, commented on McClendon's affiliation with the Republican Party, and indicated that he was going to have the FBI reconstruct materials seized from the shredder in McClendon's office.  *Id*. at 169-70, 186.  If the materials showed that McClendon had been campaigning on the job, Neven threatened to have him fired.  *Id*. at 169.  McClendon denied Neven's accusations, which he characterized as "a bunch of crap."  *Id*.

The final incident with political overtones occurred in February 2008 when Mike Schivarelli, the acting South Area Operations Manager, informed McClendon that a man named Eugene Davis ("Davis") would be reporting to the I-57 yard to assist with operations.  Schivarelli identified Davis as someone who was "assisting" Iacullo.  Stumpner testified that Iacullo instructed him to find work for Davis even though he was not employed in IDOT's Division of Highways.  Stumpner Dep. at 242-45.  Stumpner viewed Davis as one of several politically

connected employees whom Iacullo instructed him to find a place for in the Bureau of Maintenance. *Id*.

McClendon told Iacullo, Stumpner, and Schivarelli that he did not need Davis's assistance at the I-57 yard. Schivarelli responded that Davis was going to "float to most of the south area yards" starting with McClendon's work site. Dkt. No. 95-2 at 86. On February 7, 2008, Davis reported to the I-57 yard and told McClendon that, per Iacullo's instructions, Davis was there to oversee operations and would not take directions from McClendon. McClendon Dep. at 51. After McClendon objected, Iacullo and Stumpner called the I-57 yard. *Id.* at 50-51. McClendon refused to train someone who was not in the Maintenance Cadre position and told Iacullo and Stumpner to find somewhere else for Davis. *Id*. at 51. Iacullo told Davis to report back District 1 headquarters and then reassigned him to the Bishop Ford yard. *Id*. at 51-52. After the Eugene Davis incident, Stumpner verbally reprimanded McClendon and reminded him that he (Stumpner) ran the yard. *Id*. at 52-53.

## B. McClendon's union organizing

On an unspecified date between 2005 and 2007, IDOT Secretary Tim Martin ("Secretary Martin") held an open forum meeting with all of the Yard Technicians in District 1. *Id*. at 36-38, 227. McClendon asked Secretary Martin during the open forum whether IDOT would address the disparity in pay between

5

minority Yard Technicians and white employees in the same position who earned more. *Id*. McClendon thought IDOT had hired several Yard Technicians between 2003 and 2008 who received higher pay and greater opportunities for promotion than incumbent minority employees. *Id*. at 42-43. When McClendon raised this concern with his supervisors on several occasions before Secretary Martin's open forum, they promised to follow up with IDOT administrators in Springfield to see what could be done. *Id*. at 41-42. Privately, Stumpner and two human resources officials--Charles Klemz and Giovanni Fulgenzi--warned McClendon that he was going to cause problems for himself by advocating for minority workers and advised him to speak only for himself. *Id*. at 44.

In a side conversation after the public forum, Secretary Martin told McClendon that salaries were subject to the collective bargaining process, so McClendon's only remedy was to unionize the Yard Technician position. When asked if he would oppose efforts to unionize the Yard Technicians, Secretary Martin said no. Iacullo gave the same response and mentioned that Stumpner and the Area Operations Managers were also trying to unionize. *Id*. at 183.

Between 2005 and 2007, after his conversation with Secretary Martin, McClendon started trying to unionize the Yard Technicians. His activities included getting union cards

signed, attending meetings, and gathering information.  *Id.* at
179.  At some point during McClendon's union organizing
activities, Stumpner summoned him for a meeting.  Stumpner
advised McClendon that someone had complained that McClendon was
doing union business during the work day.  *Id.* at 182-83.
McClendon denied the accusation, which apparently ended the
matter.  *Id.* at 183.

In 2008 or 2009, Iacullo testified at a hearing in
Springfield that Yard Technicians could not function as
effective managers if they were unionized.  Iacullo Dep. at 55,
57.  McClendon was one of several Yard Technicians who attended
the Springfield hearing.  Stumpner saw McClendon at the hearing.
Stumpner Dep. at 246.  Iacullo does not recall seeing McClendon
at the hearing and claims that he first learned about
McClendon's union organizing activities when the present lawsuit
was filed.  Iacullo Dep. at 58-59.  In contrast, McClendon
claims that Iacullo saw him at the hearing.  McClendon Declar.
at ¶ 6.

McClendon's third and final attempt to unionize the Yard
Technician position occurred in June 2010, three months before
his termination, but he has not explained what efforts he made
or whether Defendants were aware of them.  *Id.* at ¶ 5.

## C. McClendon's grievances

In April 2007, McClendon filed the first in a series of
grievances challenging various IDOT personnel actions.
McClendon's first grievance argued that IDOT should have paid
his overtime hours from earlier that year at a higher rate.  *See*
Dkt. No. 106-1 at 87-88.  Stumpner and Iacullo denied
McClendon's grievance on the day it was filed.  *Id*.  About four
months later, in a letter dated August 7, 2007, IDOT denied
McClendon's grievance on the ground that it was untimely.  *Id*.
at 83.

In November 2007, McClendon filed a grievance challenging
IDOT's decision to have Mike Schivarelli serve as the Area
Operations Manager over two of the three areas in District 1
during the upcoming winter season instead of allowing a Yard
Technician to supervise one of the areas on an acting basis.
*See* Dkt. No. 95-2 at 123.  McClendon had previously asked IDOT
to provide Yard Technicians with the opportunity to gain
"training experience" as Area Operations Managers and "permanent
consideration for this position."  *Id*.  After McClendon
discussed the matter with his immediate supervisor, Stumpner and
Iacullo denied his grievance.  *Id*. at 121-22.  According to
McClendon, Stumpner said that IDOT could do whatever it wanted
to do with regard to the Area Operations Manager position and

told McClendon to stay in his place.  McClendon Dep. at 115, 117.

McClendon filed a third grievance on January 1, 2008, this time alleging that IDOT paid minority Yard Technicians in District 1 less than white employees holding the same position. See Dkt. No. 95-2 at 128.  McClendon's grievance referenced a meeting three years earlier when he made the same complaint to IDOT's top brass in District 1: Diane O'Keefe, the Regional Engineer; Iacullo, Assistant to the Regional Engineer; Chuck Klemz, the Administrative Services Manager; Giovanni Fulgenzi, the Personnel Manager; and Stumpner, the Maintenance Bureau Chief.  McClendon named George Harvey and Dionne Winesberry in his grievance as the other minority Yard Technicians who were being paid less than whites.

Stumpner denied McClendon's pay discrimination grievance on January 28, 2008.  Dkt. No. 95-2 at 126.  In a letter dated February 28, 2008, Iacullo advised McClendon that nine of the twenty-five Yard Technicians in District 1--including six white males, one black male not named in his grievance, and one black female--were paid less than McClendon.  Id. at 125.  Iacullo also noted that George Harvey and Dionne Winesberry had not signed McClendon's grievance or otherwise indicated that they agreed with his complaint about pay discrimination.  Id.

On March 6, 2008, Stumpner issued McClendon a written reprimand for an incident that happened two weeks earlier at an Illinois toll plaza. *See* Dkt. No. 95-2 at 93. One of McClendon's work crews encountered resistance from a toll plaza employee when they attempted to use one I-Pass for four IDOT vehicles after responding to an emergency pothole complaint. *Id.* According to Stumpner, McClendon exhibited poor supervision during the incident because he failed to inform Stumpner that his work crew was allegedly rude to the toll plaza employee and that the Illinois state police had been called to the scene. *Id.*[1] Giovanni Fulgenzi ("Fulgenzi"), the Personnel Services Manager for District 1, concurred in Stumpner's disciplinary action and issued a written reprimand to McClendon on March 12, 2008. *Id.* at 92. McClendon thinks Stumpner used the tollway incident as an opportunity to retaliate against McClendon because of his unionizing efforts and complaints about pay discrimination. McClendon Dep. at 58, 61.

On January 9, 2009, McClendon filed a grievance protesting Stumpner's refusal to appoint him as the South Area Operations Manager (a position that had been vacant since 2004) on an acting basis. *See* Dkt. No. 95-2 at 132. McClendon argued that

---

[1] In 2006, Stumpner wrote up McClendon for poor supervision even though McClendon was on an approved vacation on the day of the underlying incident. McClendon Dep. at 63-67.

Yard Technicians with less seniority had been allowed to serve
as acting Area Operations Managers and later obtained
promotions. *Id*. McClendon characterized IDOT's promotion of
less senior Yard Technicians as "discriminatory" and accused the
agency of "cronyism." *Id*. IDOT swiftly denied McClendon's
grievance three days after he filed it on the ground that the
agency's decisions about the acting Area Operations Manager
position reflected its "policy of continuity." *Id*. at 130-31.

A few weeks later, on February 5, 2009, McClendon filed a
grievance challenging his most recent annual performance
evaluation. *Id.* at 136. McClendon's immediate supervisor,
Tricia Robinson, gave him the highest possible rating, but
Stumper lowered his rating because of an incident that occurred
during a snowstorm in December 2008. *Id*. Stumpner wrote,
"During this rating period, Mr. McClendon directed his
maintenance yard to go home despite the Storm Duty Manager [sic]
orders to keep four trucks and a LW [lead worker] out." *Id*. at
142. In his grievance, McClendon argued that this incident fell
outside of the December 2007 to November 2008 rating period for
his performance evaluation. *Id*. McClendon also asked Stumpner
why he would not allow an "exceeds expectations" rating from a
black supervisor, Tricia Robinson, to stand while he would
overturn a white supervisor's ratings. McClendon Dep. at 141.

Stumpner ultimately granted McClendon's grievance and corrected his 2008 performance evaluation. Dkt. No. 95-2 at 135.

Two weeks later, on February 17, 2009, McClendon filed a second grievance--similar to the one he filed in January 2008-- alleging that minority yard technicians were being discriminated against with regard to pay, allocation of equipment, overtime hours, and job assignments. *Id*. at 565. McClendon said he had raised these issues with his supervisors--in some cases as early as 2003--to no avail. *Id*. McClendon referenced the possibility of legal action, but urged IDOT to address his concerns in a cooperative fashion. IDOT did not immediately act on McClendon's grievance.

In April 2009, Iacullo, Stumpner, and Schivarelli announced that all of the maintenance yards in District 1 would be consolidated for the summer months. McClendon Dep. at 34. Under the yard consolidation plan, McClendon was initially assigned to lead a day labor crew. *Id.* at 53-54. Iacullo and Stumpner then transferred McClendon from the day labor crew to manage the Alsip yard, which was known for having racial tensions. *Id*. at 77, 193. While McClendon was training as a Maintenance Cadre in 1999 or 2000, Stumpner attempted to assign him to the Alsip yard, but encountered resistance. *Id*. at 48. The Yard Technician and Lead Worker at the Alsip yard allegedly

commented on the color of McClendon's skin and told Stumpner to send him elsewhere. *Id.*

McClendon objected to his reassignment to the Alsip yard in 2009 and told Stumpner, "You are just doing this because of my efforts." *Id.* at 79. After McClendon started his assignment at the Alsip yard, white employees began to request transfers because they did not want to work for a black supervisor. *Id.* at 79-80. McClendon's interactions with some of the white employees under his supervision became hostile--to the point that they used racial slurs against him--but Iacullo and Stumpner did nothing when the issue was brought to their attention. *Id.* at 190-91. When McClendon reported that employees had called him a nigger, commented about his car, and even called the police on him, Stumpner told McClendon that he needed to have tougher skin. *Id.* at 191. McClendon repeatedly requested a transfer out of the Alsip yard and eventually returned to the I-57 yard in 2010. *Id.* at 83.

On July 14, 2009, an IDOT grievance panel held a hearing to consider McClendon's two grievances relating to the Area Operations Manager position (filed in November 2007 and January 2009, respectively) and his two grievances relating to racial disparities in pay (filed in January 2008 and February 2009, respectively). The three member grievance panel concluded (1) that IDOT had not violated any provision of its personnel

policies manual in not appointing McClendon to the Area
Operations Manager position on an acting basis and (2) that
McClendon had failed to present evidence showing that he was
being paid less than other Yard Technicians because of his race.
*Id.* at 157.  IDOT Secretary Gary Hannig adopted the panel's
recommendations and denied McClendon's grievances.  *Id*. at 158.

At some point between 2008 and 2010, as McClendon's
grievances were escalating, Stumpner called McClendon and two
other black employees, George Martin and Hiram White, into his
office.  McClendon Dep. at 153, 166.  Stumpner said they needed
to get with the program or quit.  *Id*. at 153.  McClendon
responded, "Is this about the three Negroes or three amigos?"
*Id*.  The three amigos was a reference to John Bilski, Ray Frais,
and Jack Neven, three white employees who started during the
Blagojevich administration and were advancing faster than
McClendon despite having less seniority.  *Id*.  During one of
McClendon's previous conversations with Stumpner about race
discrimination, McClendon brought up IDOT's treatment of Tony
Ross, an African-American technician at the Alsip yard.  *Id*. at
155.  Stumpner responded that he did not want "this kind working
for him."  *Id*.  McClendon interpreted Stumpner's remark as a
comment about race.  *Id*. at 155, 225.  Ross ended up resigning
from IDOT.  *Id*. at 225.

## D. McClendon's termination

The events that led to McClendon's termination occurred in parallel with the series of grievances he filed between November 2007 and February 2009.

In 1999 or 2000, McClendon told Stumpner that he was going to start teaching a commercial driver's license ("CDL") course at Olive-Harvey College in Chicago, Illinois. Stumpner Dep. at 169.[2] Stumpner asked McClendon to obtain assurance from the college that his teaching schedule would not interfere with his IDOT work, such as responding to snowstorm calls and other emergencies. *Id*. at 169-70. To assuage Stumpner's concerns, McClendon presented him with a letter from Olive-Harvey College stating that it would allow McClendon to prioritize his IDOT job duties over his teaching duties if there was ever a conflict between the two. *Id*. at 170.

In 2006, IDOT implemented a new policy that required every employee with a secondary job to submit a form identifying the job and obtain his or her supervisor's approval. *Id*. at 165-66, 203. The next year, IDOT circulated a memo indicating that the secondary employment form must be submitted on an annual basis. *Id*. at 174.

---

[2] McClendon says that he started teaching at Olive-Harvey College in 2002, *see* McClendon Dep. at 11, but the precise start date of his outside employment is irrelevant.

In February 2008--while McClendon's first grievance alleging racial disparities in pay was still pending--Stumpner learned that McClendon had never submitted a secondary employment form and instructed him to complete one. *Id*. at 172-73, 198-99. Stumpner does not recall how this issue came to his attention. *Id*. at 172-73. McClendon thought his prior conversation with Stumpner and the letter he submitted from Olive-Harvey College satisfied IDOT's secondary employment requirements, but he agreed to submit the new form. *Id*. at 173-74. McClendon completed the form on or around February 28, 2008 and presented it to Stumpner for signature. *Id*. at 174-75, 198, 220.

Stumpner signed and dated the form, but did not approve McClendon's secondary employment based on his concern about how many hours McClendon claimed to be working at Olive-Harvey College (i.e., thirty per week). *Id*. at 175-76, 206. Stumpner expressed this concern to McClendon, who agreed to obtain another letter from the college indicating that it would allow McClendon to prioritize his IDOT work schedule. *Id*. at 176. For reasons not apparent from the record, McClendon did not obtain such a letter from Olive-Harvey College and present it to Stumpner until January 2009. *Id*. at 202.

At his deposition, Stumpner testified that he was never concerned about a possible overlap between the hours McClendon

reported on his IDOT timecard and his Olive-Harvey teaching
schedule until the Office of Executive Inspector General
("OEIG") announced its findings about that issue in June 2010.
*Id.* at 183-84. In fact, Stumpner said the first time he even
learned that OEIG was investigating McClendon's time records was
in November 2008 when they interviewed him. *Id.* at 193-94.
Before OEIG released its report, Stumpner claims that his only
concern with McClendon's outside employment was whether he could
leave class to address IDOT emergencies. *Id.* at 184.

In actuality, Iacullo and Stumpner were both aware that
IDOT had launched an internal investigation into McClendon's
work hours in March 2008, only weeks after IDOT had denied his
grievance alleging race discrimination in pay. On March 14,
2008, IDOT's personnel manager, Fulgenzi, informed Iacullo and
Stumpner that he had contacted Olive-Harvey College to check on
McClendon's class schedule. *Id.* at 204.

About one week later, Fulgenzi copied Iacullo and Stumper
(among others) on an email to IDOT's Office of Quality
Compliance and Review in which Fulgenzi reported the findings of
his investigation. *Id.* at 212. Fulgenzi's report began by
saying, "In the course of a civil rights investigation, it was
brought to our attention that Mr. McClendon holds a secondary
employment with the Chicago City Colleges where he is a driving
instructor in CDL courses offered at Olive-Harvey campus."

Pl.'s Ex. 9 at 001139.  Fulgenzi learned from Olive-Harvey
College that McClendon taught class five nights per week from
4:00 pm to 10:00 pm.  *Id*.  Fulgenzi then compared McClendon's
teaching schedule and his IDOT sign in sheets from December 2007
through March 2008.  *Id*.  After noting that McClendon "has
worked extensive overtime during off hours," Fulgenzi concluded
that some of McClendon's reported IDOT hours "would surely be in
conflict with his work schedule at Olive-Harvey."  *Id*. at
001140.  Specifically, Fulgenzi highlighted thirty instances of
McClendon reporting overtime hours between 4:00 pm and 10:00 pm
when he was supposedly teaching.  *Id*.

In terms of next steps, Fulgenzi recommended referring the
matter to OEIG for further investigation--namely, to obtain
records showing the hours that McClendon actually worked at
Olive-Harvey College.  *Id*. at 001141.  OEIG promptly launched
its own investigation into McClendon's reported overtime hours.
Stumper was interviewed by OEIG investigators in November 2008
and later provided them with copies of IDOT directives relating
to work hours.  *Id*. at 184, 192, 219.  The investigators told
Stumpner they were looking into McClendon's time records and
questioned him about time cards and sign sheets they had already
gathered.  *Id*. at 191-93.  OEIG never interviewed Iacullo.
Iacullo Dep. at 168.

18

McClendon recalls OEIG investigators removing his office computer in 2008. McClendon Dep. at 89-90. They told McClendon he was the subject of an anonymous complaint, but would not disclose the specific allegations against him. *Id*. at 90. In December 2008, OEIG investigators interviewed McClendon in the presence of his attorney about his secondary job. McClendon Dep. at 91-92.

In January 2009, McClendon presented Stumpner with a letter from Olive-Harvey College stating that it would continue to accommodate his IDOT work schedule. *Id*. at 202. Upon receiving this letter, Stumpner surprisingly *approved* McClendon's secondary employment--and granted a grievance McClendon had filed relating to the delayed approval--even though IDOT's internal investigation had concluded that McClendon "surely" engaged in timecard fraud and OEIG's investigation was still ongoing. Stumpner Dep. at 179, 201, 215. Stumpner says the letter satisfied his earlier concerns about McClendon's secondary employment. *Id*. at 195, 202.

In June 2010, OEIG concluded that (1) McClendon engaged in unauthorized secondary employment from 2006 until February 2008; (2) McClendon had submitted fraudulent overtime hours; and (3) Stumpner had abdicated his supervisory responsibility by failing to approve or deny McClendon's secondary employment request in

February 2008.[3] Due to imprecision in IDOT's and Olive Harvey's timekeeping practices, OEIG could not say with certainty that McClendon had defrauded either employer. Instead, OEIG simply compared his time records--as Fulgenzi did before referring the matter for further investigation in March 2008--and found it more likely than not that McClendon had submitted fraudulent IDOT overtime hours when he was actually working at Olive-Harvey College.

On August 17, 2010, McClendon filed an internal discrimination and harassment complaint in which he recounted the various incidents documented in his previously filed grievances and attempted to rebut OEIG's findings. *See* Dkt. No. 95-2 at 160-66. McClendon explained that he had a "special arrangement" with Olive-Harvey College that allowed him to prioritize IDOT work and correct any discrepancies in his timesheets by working outside of his scheduled hours or submitting an amended time card. *Id*. at 161-62.

IDOT held a pre-disciplinary meeting with McClendon on August 23, 2010 in its Schaumberg office. After the hearing, McClendon submitted a written rebuttal to the charges against him in which he reiterated that his timesheets at Olive-Harvey College were completed two weeks before pay days. *Id*. at 118-

---

[3] *See* https://www.illinois.gov/oeig/Documents/08-00249_McClendon_121610.pdf (last visited July 31, 2015).

19.  McClendon further explained, "If I missed a day was late or had to leave early I informed the office secretary in order for her to make the necessary adjustments to payroll or to work an off day upon the director's approval." *Id*. at 119.

On September 14, 2010, IDOT fired McClendon, ostensibly because of OEIG's finding that he had submitted fraudulent overtime hours.  Iacullo and Stumpner participated in and supported the decision to fire McClendon.  Stumpner Dep. at 185-86, 188.  Stumpner initially claimed that he relied solely on OEIG's report when deciding to support McClendon's termination. *Id*. at 188.  Later, after Stumpner was confronted with Fulgenzi's email from March 2008 concluding that McClendon's reported overtime hours "surely" overlapped with his Olive-Harvey teaching schedule, Stumpner admitted that IDOT uncovered the facts that ultimately led to McClendon's termination and forwarded them to OEIG for further investigation.  *Id*. at 214-15.

In contrast to McClendon, an IDOT Yard Technician named Wilmer Caraballo was suspended for only seven days and given an opportunity to resign after OEIG concluded in January 2011 that he had misused state time and a state vehicle, falsified his time records, and violated IDOT's conflict of interest policy. *Id*. at 235-36.

## E. EEOC charge and lawsuit

McClendon contacted the U.S. Equal Employment Opportunity Commission ("EEOC") on September 15, 2010, one day after IDOT fired him. The EEOC sent McClendon a letter the next day explaining that he needed to complete an intake questionnaire to begin the charge filing process. *See* Pl.'s Ex. 12. McClendon then completed an intake questionnaire--in which he alleged race discrimination and retaliation--and mailed it to the EEOC on November 16, 2010. *Id*.

On August 31, 2011, McClendon filed a formal charge with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging race discrimination and retaliation. Dkt. No. 95-2 at 169. Four months later, in December 2011, EEOC advised McClendon that his charge was untimely and issued him a right to sue letter. *Id*. at 171.

In his amended complaint, McClendon claims that IDOT fired him because of his race (Count I) and retaliated against him for complaining about race discrimination (Counts II). He also claims that Iacullo and Stumpner retaliated against him after he complained about race discrimination (Count III); violated his equal protection rights by discriminating against him because of his race (Count IV); and violated his First Amendment rights by retaliating against him because he supported the Republican Party and attempted to unionize the Yard Technicians (Count V).

## II. Statute of limitations defense

As a preliminary matter, IDOT argues that McClendon's termination and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, are time barred because he did not file an EEOC charge until August 31, 2011, more than 300 days after IDOT fired him.  *See Bass v. Joliet Public Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014) ("Title VII provides that a charge of employment discrimination must be filed with the EEOC within 300 days of the alleged unlawful employment practice, in deferral states like Illinois.").  McClendon counters that the three-page complaint he filed with the EEOC in September 2010 and the completed intake questionnaire he submitted in November 2010 are the functional equivalent of a formal EEOC charge for purposes of the 300 day limitations period.

In *Federal Express Corp. v. Holowecki*, 552 U.S. 389 (2008), the Supreme Court held that "if a filing [with the EEOC] is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee."  *Id.* at 402.  "[U]nder this permissive standard a wide range of documents might be classified as charges."  *Id.* "[T]he filing must be examined from the standpoint of an objective observer to determine whether, by a reasonable

construction of its terms, the filer requests the agency to activate its machinery and remedial processes." *Id.; see also* 29 C.F.R. § 1601.12(b) (Title VII regulation stating that "a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of").

*Holowecki* compels the conclusion that McClendon's three-page complaint and completed intake questionnaire satisfy Title VII's charge filing requirement. In his first communication with the EEOC in September 2010, McClendon asserted that he had been fired because of his race, described several of the incidents at issue in this case, and asked the EEOC to tell him if he had any "recourse." *See* Pl.'s Ex. 8. McClendon submitted an intake questionnaire two months later at EEOC's request in which he reiterated his belief that IDOT had fired him because of his race and in retaliation for complaining about discrimination. *Id*. McClendon's submissions are materially indistinguishable from the two filings that the Supreme Court deemed sufficient to satisfy the charge filing requirement in *Holowecki*: a six-page affidavit in which the complainant asked the EEOC to take action and a completed intake questionnaire. 552 U.S. at 405-6; *see also Philbin v. Gen. Electric Capital Auto Lease, Inc.*, 929 F.2d 321 (7th Cir. 1991) (per curiam)

(holding that EEOC intake questionnaire satisfied statutory charge filing requirement); *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534 (7th Cir. 1988) (same). Therefore, IDOT's statute of limitations defense fails.

### III. Merits

On the merits, Defendants are entitled to summary judgment only if they "show[] that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby, Inc.*, 477 U.S. at 248.

### A. Title VII and Section 1981 retaliation claims

In Counts II and III, McClendon claims that Defendants retaliated against him because he accused IDOT of paying minority Yard Technicians less than their white peers.

The same legal standard applies to McClendon's retaliation claims under Title VII (Count II) and 42 U.S.C. § 1981 ("Section 1981") (Count III). *See Mintz v. Caterpillar, Inc.*, 788 F.3d 673, 679 (7th Cir. 2015). Iacullo and Stumpner are correct that individual employees may be held liable under Section 1981 only if they "participated" in the retaliatory conduct. *Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015). Here,

25

Section 1981's personal involvement requirement is easily satisfied because of Stumpner's testimony that he and Iacullo participated in and supported the decision to fire McClendon. Stumpner Dep. at 185-86, 188. Whether a jury could find that they acted with retaliatory intent is a separate question addressed below as part of the causation analysis.

Under the direct method of proof, McClendon is entitled to a trial on the merits if he presents evidence "(1) that he engaged in protected activity, (2) that he was subjected to an adverse employment action, and (3) that there was a causal link between the protected activity and the employment action." *Hobgood v. Illinois Gaming Board*, 731 F.3d 635, 642 (7th Cir. 2013).

Defendants' argument that McClendon did not engage in any statutorily protected activity is disingenuous. To be sure, not all of McClendon's grievances accused IDOT of engaging in race discrimination. *See Crawford v. Metro. Gov't of Nashville and Davidson Cnty, Tenn.*, 555 U.S. 271 (2009) (Title VII's anti-retaliation provision protects employees who have "opposed any practice made an unlawful employment practice by this [statute]" (quoting 42 U.S.C. § 2000e-3(a))). Defendants, however, overlook the fact that McClendon explicitly complained about racial discrimination on at least four occasions: (1) between 2005 and 2007 during Secretary Martin's open forum in District

1; (2) in his January 2008 grievance concerning racial disparities in pay; (3) in his January 2009 grievance concerning the Acting Operations Manager position; and (4) in his February 2009 grievance alleging a broad array of discrimination against minority Yard Technicians.  To say that McClendon did not engage in any statutorily protected activity is to ignore this litany of evidence.

The second element of McClendon's retaliation claims--which asks whether he was subjected to an adverse employment action-- also requires little discussion.  Title VII's ban on retaliation "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 64 (2006).  "Rather, Title VII's anti-retaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Thompson v. N.A. Stainless, LP*, 562 U.S. 170, 174 (2011) (quoting *White*, 548 U.S. at 68).  Defendants argue that McClendon was not subjected to any adverse actions because he successfully grieved Stumpner's decision to downgrade his 2008 performance evaluation.  *See* Dkt. No. 96 at 12.  That fact is neither here nor there.  McClendon

was fired, which is a quintessentially adverse action.[4]  *See*
*Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir.
2006) (firing an employee "clearly constitute[s] a materially
adverse action" for purposes of a retaliation claim).

The crux of McClendon's retaliation claims is whether a
reasonable jury could find that Defendants retaliated against
him because he complained about race discrimination.  *See Univ.*
*of Tex. SW Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)
("Title VII retaliation claims require proof that the desire to
retaliate was the but-for cause of the challenged employment
action.").  McClendon has not presented direct evidence of
causation--i.e., something akin to an admission that IDOT fired
him because of his protected activities--so he must rely on
circumstantial evidence.

"A convincing mosaic [of circumstantial evidence] must
include evidence from which an inference of retaliatory intent
could be drawn."  *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635,
643 (7th Cir. 2013).  The accepted categories of circumstantial
evidence that, taken together, may support an inference of
causation include:

---

[4] Although McClendon complains about a wide variety of workplace
issues, he has not argued that anything other than his
termination constitutes an "adverse action" for purposes of his
discrimination and retaliation claims.  Nor is he pursuing a
hostile environment claim relating to the Alsip Yard.

"(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action."

*Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 659-60 (7th Cir. 2013).

I start with McClendon's evidence of suspicious timing. In January 2008, McClendon filed a grievance alleging that IDOT was engaging in pay discrimination against minority Yard Technicians. This was certainly not the first grievance McClendon filed during his employment at IDOT. What distinguishes the January 2008 grievance from McClendon's previous complaints is his explicit allegation of race discrimination and IDOT's response. Whereas IDOT had swiftly rejected McClendon's previous grievances, this time the agency opened a parallel inquiry into his secondary employment with Olive-Harvey College.

In February 2008, Stumpner says that it somehow came to his attention that McClendon had not completed a secondary employment form pursuant to an IDOT policy implemented in 2006. A jury could reasonably find a causal connection between (1) McClendon's grievance alleging race discrimination and (2) IDOT's sudden, unexplained interest in a secondary employment form that should have been completed two years earlier and

apparently did not matter to IDOT until shortly after McClendon engaged in protected activity.  To dismiss the temporal proximity between these two events as pure coincidence would be inconsistent with the summary judgment standard.

In March 2008, IDOT concluded that some of McClendon's reported overtime hours were "surely" in conflict with his Olive-Harvey teaching schedule.  Pl.'s Ex. 9 at 001140.  Iacullo and Stumpner were copied on the email in which Fulgenzi reported this finding to IDOT headquarters and recommended referring the matter to OEIG for further investigation.  OEIG's final report repeated Fulgenzi's methodology on a larger scale and inferred, on the basis of overlapping time sheets, that McClendon had probably submitted fraudulent IDOT overtime hours.  IDOT claims that it fired McClendon solely on the basis of OEIG's findings.

A reasonable jury could find that IDOT's stated basis for firing McClendon was a pretext for retaliatory motives.  *See Vaughn v. Vilsack*, 715 F.3d 1001, 1008 (7th Cir. 2013) (focus of pretext inquiry is whether "proffered reason for [adverse action] is a lie").  IDOT concluded in March 2008 that McClendon had "surely" submitted fraudulent overtime hours--which was supposedly a fireable offense--yet it kept him on the payroll for another year and a half while OEIG was investigating the matter.  IDOT may have been waiting for corroborating evidence, but OEIG's final report added little to the factual basis that

30

already existed for firing McClendon in March 2008.  At a minimum, the long delay between IDOT's finding that McClendon had submitted fraudulent overtime hours and its decision to fire him raises a triable question of fact about whether the stated reason for his termination was a lie.  The notion that IDOT, Iacullo, and Stumpner would knowingly allow McClendon to continue claiming fraudulent overtime hours for one and a half years before firing him is sufficiently implausible to support an inference of pretext.  *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007) (employee may establish pretext by "identify[ing] such weaknesses, implausibilities, inconsistencies, or contradictions in [employer's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [employer] did not act for the asserted non-discriminatory reasons").

Stumper's testimony also casts doubt on IDOT's stated reason for firing McClendon in September 2010.  Stumpner approved McClendon's secondary employment in January 2009 even though (a) IDOT had concluded in March 2008 that McClendon was "surely" engaging in timecard fraud and (b) OEIG was still investigating the matter.  Stumpner admits that his actions made no sense if IDOT had truly been concerned about McClendon's outside employment.  *See* Stumpner Dep. at 222.

Moreover, Stumpner provided conflicting testimony about when he first became aware of OEIG's investigation and a possible overlap between McClendon's overtime hours and his teaching schedule. Stumpner initially said he was unaware of OEIG's investigation until November 2008 and unconcerned about McClendon's claimed overtime hours until OEIG released its findings in June 2010. When confronted with emails from March 2008, however, Stumpner admitted that he knew about IDOT's investigation into McClendon's outside employment and OEIG's follow on investigation from their inception. Stumpner's shifting statements about what he knew and when he knew it call into question whether IDOT's stated reason for firing McClendon was truthful or a pretext for retaliation. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 577 (7th Cir. 2015) ("As a general rule, a reasonable trier of fact can infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision.").

In sum, McClendon is entitled to present his retaliation claims to a jury because of (1) the suspiciously close timing between his grievance about race discrimination and IDOT's sudden interest in scrutinizing his outside employment; (2) the implausibility that IDOT would knowingly allow him to continue submitting fraudulent overtime hours for one and a half years before firing him for that offense; and (3) Stumpner's

32

mysterious approval of McClendon's outside employment in January 2009 and his shifting statements about when he learned about IDOT's internal investigation and OEIG's follow on investigation. *See Hobgood*, 731 F.3d at 644 (denying employer's motion for summary judgment because of circumstantial evidence that employer launched a "retaliatory witch hunt" with a predetermined outcome shortly after employee engaged in protected activity).

## B. Termination claims

McClendon lacks direct evidence that IDOT fired him at Iacullo's and Stumpner's recommendation because of his race, so I analyze his termination claims (Counts I and IV) under the indirect method of proof. That method applies equally to Title VII and Section 1983 equal protection claims. *See Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011).

> To survive summary judgment under this method, [McClendon] must produce evidence that he (1) belongs to a protected class, (2) met his employer's legitimate performance expectations, (3) suffered an adverse employment action, and (4) was treated worse than similarly situated employees outside the protected class.

*Id*. (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "If [McClendon] satisfies these elements, he must then prove that any legitimate, nondiscriminatory reasons offered for the adverse action are pretext." *Id.*

McClendon is a black male who was fired, so he easily
satisfies the first and third elements of the indirect method.
IDOT argues that McClendon was not meeting their legitimate
performance expectations because OEIG uncovered evidence that he
was submitting fraudulent overtime hours.  McClendon counters
that IDOT treated a similarly situated, non-black employee more
favorably after OEIG found that he also submitted fraudulent
overtime hours.  In cases of allegedly discriminatory
discipline, the second and fourth elements of the *McDonnell
Douglas* framework merge such that the proper inquiry is "whether
[the non-black] employee engaged in similar misconduct yet
received lighter punishment."  *Baker v. Macon Resources, Inc.*,
750 F.3d 674, 676 (7th Cir. 2014).

Defendants argue that McClendon's proposed comparator,
Wilmer Caraballo, is not similarly situated because "OEIG['s]
investigation indicated that Carrabello [sic] falsified his
timekeeping records on four or five days, not for six years, and
Carrabello [sic] was not getting paid by another employer as a
result of him falsifying his timekeeping record."  Dkt. No. 96
at 8-9.  A reasonable jury *could* distinguish McClendon and
Caraballo on those two grounds, but that is not the only way to
view the evidence.  OEIG did not have direct evidence that the
overtime hours McClendon submitted were fraudulent.  It simply
drew an inference on the basis of McClendon's overlapping time

sheets. Neither IDOT nor OEIG investigated McClendon's explanation for the apparent overlap (i.e., that Olive-Harvey College allowed him to correct any discrepancies between his timesheet and the hours he actually worked by working unrecorded hours outside his normal schedule or submitting an amended timecard).

In contrast to the circumstantial evidence against McClendon, OEIG agents witnessed Caraballo engage in time card fraud on each of the five days they surveilled him in October and November 2009.[5] Caraballo also admitted to OEIG agents during an interview that he occasionally took one to two hour lunch breaks and rarely documented these extended breaks on his timesheets. He also admitted that, over the course of four or five months, a personal friend visited him at the Gurnee Yard once a week for one to two hours at a time. In other words, OEIG agents uncovered direct evidence that Caraballo submitted fraudulent time cards on one hundred percent of the days they surveilled him and obtained damning admissions from him whereas they uncovered only circumstantial evidence against McClendon.

As for Defendants' argument that McClendon's misconduct was more serious than Caraballo's because McClendon was cheating both IDOT and Olive Harvey College, there is no evidence in the

---

[5] *See* https://www.illinois.gov/oeig/Documents/09-00645_Caraballo_06.17.11.pdf (last visited July 31, 2015).

record supporting that contention.  OEIG concluded that McClendon had submitted fraudulent timesheets to IDOT, not Olive Harvey College or both employers.

Viewing the evidence in the light most favorable to McClendon, a jury could reasonably find that Caraballo's misconduct was at least as serious as McClendon's, yet McClendon received more severe punishment.  Defendants' disparate treatment of McClendon and a similarly situated, non-black comparator raises an inference of discrimination.  The additional steps in the *McDonnell Douglas* burden shifting framework are redundant here because McClendon can use the same comparator evidence to rebut Defendants' argument that OEIG's findings constituted a legitimate, non-discriminatory reason for firing him.  *See Coleman*, 667 F.3d at 841 ("[A]n employment discrimination plaintiff may demonstrate pretext by providing evidence that a similarly situated employee outside her protected class received more favorable treatment.").

The bottom line is that McClendon is entitled to a trial on his termination claims against IDOT, Iacullo, and Stumpner.  A jury must decide whether Defendants' disparate treatment of McClendon and Caraballo has a non-discriminatory explanation.

## C. First Amendment retaliation claim

McClendon's final claim is that Iacullo and Stumpner retaliated against him because he engaged in protected First Amendment expression.

"To succeed, [McClendon] must make out a prima facie case of retaliation, demonstrating that: '(1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating factor in the employer's actions.'" *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012) (quoting *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)).

The third factor, causation, is fatal to McClendon's claim that Iacullo and Stumpner fired him because he supported the Republican Party.  McClendon disclosed his political affiliation to Stumpner in 2000 or 2004 when he asked for vacation time to attend former President George W. Bush's inauguration.  In 2005, Iacullo and Stumpner ordered a search of McClendon's office for evidence of whether he was engaging in political activities on the job.  In the aftermath of that search, a jury could infer from Iacullo's comments that he was aware of McClendon's political affiliation.  The final incident with political overtones occurred in February 2008 when Eugene Davis--who appeared to have political ties with the IDOT's Democratic

administrators--was sent to oversee the operations at McClendon's maintenance yard for one day.

No reasonable jury could find that these three incidents were a substantial or motivating factor for IDOT's decision to fire McClendon in September 2010.  The search of McClendon's office that Iacullo and Stumpner ordered in 2005 arguably shows that they targeted him because of his political affiliation, but this occurred five years before the adverse action at issue in this case.  *Id.* at 966 (suspicious timing does not give rise to an inference of causation unless adverse action follows "close on the heels" of protected activity).  The Eugene Davis incident occurred closest in time to McClendon's termination--two and a half years beforehand--but had only mild or vague political overtones.  I do not question McClendon's subjective belief that his political views hurt his career at IDOT.  With that said, he has not presented evidence from which a reasonable jury could conclude that his political views were a substantial or motivating factor in IDOT's decision to fire him.  *See Sanchez v. Henderson*, 188 F.3d 740, 747 (7th Cir. 1999) ("[A]s a matter of law, mere knowledge of the plaintiff's protected activity prior to an adverse employment action does not establish a retaliatory motive.").

McClendon's claim that Iacullo and Stumpner retaliated against him because of his union organizing activities also

fails on causation grounds.  McClendon started his union

organizing activities between 2005 and 2007 after former IDOT

Secretary Martin told him that collective bargaining was the

only way to address his complaint about Yard Technician

salaries.  Stumpner warned McClendon that he might cause

problems for himself by advocating for minority workers, but he

did not express hostility to the idea of unionizing per se.

McClendon later attended a hearing in 2008 or 2009 at which

Iacullo testified that Yard Technicians were managers who could

not effectively perform their duties if they joined the same

union as the employees they supervised.  McClendon says he made

a final attempt to unionize the Yard Technicians in June 2010,

but he provides no detail about his specific activities or

whether Iacullo and Stumpner were aware of them.

On the evidentiary record McClendon has presented, no

reasonable jury could find that his union organizing activities

played a role in the series of events that led to his

termination in September 2010.  Again, the fact that Iacullo and

Stumpner were aware of McClendon's attempts to unionize the Yard

Technicians--and took an opposing stance on the issue--does not

support an inference that they retaliated against him.  *Id*.

## IV. Conclusion

In conclusion, I deny Defendants' motion for summary

judgment on McClendon's termination and Title VII retaliation

claims (Counts I through IV), but grant their motion with respect to his First Amendment retaliation claim (Count V).

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

Dated: July 31, 2015